IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OSCAR MUNOZ, individually, and ) <br> MUNOZ SONS TRUCKING, LLC, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> NUCOR STEEL KANKAKEE, INC., and ) <br> MATERIAL CONTROL, INC. d/b/a, ) <br> COTTERMAN COMPANY, ) <br> ) <br> Defendants. ) <br> ) | Case No. 18-cv-3451 <br><br> Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

After truck driver Oscar Munoz fell from a rolling staircase while making a delivery on Defendant's property, he and his company Munoz Sons Trucking, LLC (collectively "Plaintiffs")[1] filed a complaint against Nucor Steel Kankakee, Inc. ("Defendant")[2] [73], arguing that Defendant's maintenance of the rolling staircase was negligent or, in the alternative, willful and wanton. Plaintiffs moved for summary judgment [81] on Defendant's affirmative defenses based on an exculpatory agreement signed by Plaintiff. Defendant filed a cross motion for summary judgment [88] based on those same defenses. For the reasons explained below, the Court denies Plaintiffs' motion for summary judgment [81] and grants Defendant's motion for summary judgment [88]. A final judgment consistent with Federal Rule of Civil Procedure 58 will enter in favor of the remaining Defendant and against all Plaintiffs. Civil case terminated.

---

[1] When this order uses the term "Plaintiff" as a singular noun, it refers to Plaintiff Oscar Munoz.

[2] Plaintiffs settled their claims with the other Defendant in this case, Material Control, Inc. d/b/a Cotterman Company. [See 48].

I.  **Background**

   A.  **Rule 56.1 Statements**

When ruling on summary judgment motions, the Court generally takes all relevant facts from the parties' Local Rule 56.1 statements. Rule 56.1 is designed to facilitate this approach by streamlining the Court's review of the case and identification of triable issues. *See Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir.2011). This rule requires, among other things, that parties include relevant facts in their Rule 56.1 statements instead of "cit[ing] to raw record materials" in their briefs. *Mervyn v. Nelson Westerberg, Inc.*, 76 F. Supp. 3d 715, 719–20 (N.D. Ill. 2014) (collecting cases). To promote judicial efficiency, courts are "entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). That said, courts are also entitled to consider any material in the record, even if it is not cited by either party. Fed. R. Civ. P. 56(c)(3); see also, *e.g.*, *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[I]t is clear that the decision whether to apply [Rule 56.1] strictly or to overlook any transgression is one left to the district court's discretion.").

Here, judicial efficiency calls for doing just that. Specifically, Defendant relies on facts related to Plaintiff's experience at Defendant's facility. [See, *e.g.*, 89, at 4] (relying on fact that Plaintiff had experience using rolling staircase at Defendant's facility). These facts are not in Defendant's Rule 56.1 statement. However, they are directly supported by Plaintiff's deposition. [See 83-1, at 26:9–29:16] (explaining that Plaintiff began making deliveries to Defendant's facility and using the rolling staircase in 2016). Defendants also rely on facts related to Plaintiff Munoz Sons Trucking LLC's contractual relationship with Starline Trucking. [See, *e.g.*, 89, at 6] (relying on fact that Plaintiff was free to reject dispatches offered by Starline Trucking). These facts are similarly absent from Defendant's Rule 56.1 statement, but they are directly reflected in Starline

Trucking's Rule 30(b)(6) deponent's testimony. [83-5, at 44:14–23] (explaining that contractors with Starline Trucking are free to reject dispatches). Moreover, Plaintiffs' combined reply and response brief does not explicitly take issue with the facts themselves nor does it raise Defendant's failure to comply with Rule 56.1. [See 99]. Judicial efficiency would be hampered by ignoring these undisputed facts of record, and therefore the Court declines to do so. As such, it takes the facts, detailed below, from the parties' 56.1 statement as well as its own review of the record, which is not long or overly complicated.

**B.    Facts[3]**

Plaintiff is a self-employed truck driver working for his company Munoz Sons Trucking, LLC. [83, at ¶¶ 1–2, 5]. Plaintiff is the sole owner of the company. [85-1, at 9:16–10:1]. In 2016, Plaintiff Munoz Sons Trucking LLC entered into an independent contractor agreement with Starline Trucking. [83, at ¶ 6; 83-4]. After entering into this agreement, Plaintiff began driving to Defendant's facility to deliver scrap steel. [83-1, at 26:9–17]. Plaintiff went to Defendant's facility five times a week. [*Id.*, at 28:2–7]. Defendant prohibits drivers from jumping off of the back of their truck. [83, at ¶¶ 16–17; 83-9, at ¶ 12]. Drivers use a rolling staircase provided by Defendant to exit the back of their trucks.[4] [93, at ¶ 16; 83-1, at 23:21–24; 83-8, at 12:3–13:4].

---

[3] Generally, the Court considers cross-motions for summary judgment one at a time, construing all facts and drawing all reasonable inference in favor of the non-moving party. *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). Because the Court finds that Defendant is entitled to summary judgment, it construes the record in the light most favorable to Plaintiff in laying out the facts here.

[4] Defendant asserts that truck drivers are not required to use its rolling staircase and that instead drivers may their own ladders. [93, at ¶ 16]. Although Defendant's Health and Safety Director testified to that effect [83-8, at 12:21–13:4], Plaintiff testified that there were signs at Defendant's facility "at the time of th[e] accident about not using your own ladder." [83-1, at 23:21–24:1]. Thus, there is a question of fact as to whether Plaintiff was required to use the rolling staircase or merely permitted to do so, although this fact is not material.

Plaintiff used the rolling staircase to access the back of his truck and sweep out his truck when necessary. [83-1, at 27:17–28:11].

Pursuant to the agreement with Starline Trucking, Plaintiff hauled scrap steel from Waukesha Iron Company to Defendant. [83, at ¶ 6]. Waukesha Iron is a customer of Starline Trucking. [*Id.*, at ¶ 7]. Defendant paid Waukesha Iron for the scrap steel; Waukesha Iron paid Starline trucking a fee to transport the steel; and Starline Trucking then passed a portion of that fee to Plaintiff. [*Id.*, at ¶¶ 8–9]; [83-4, at 12]. In 2018, Plaintiff's income from deliveries to Defendant accounted for $33,338.72 or 18% of his total income. [83, at ¶ 11]. His income from deliveries to Defendant during six months in 2018 accounted for more than 25% of his income, and in April 2018, it accounted for roughly 40% of his income. [*Id.*, at 11–12].

On January 8, 2018, Plaintiff signed a Gate Entry Agreement ("Agreement") required by Defendant. [*Id.*, at 13; 83-7]. He had signed similar agreements in 2016 and 2017. [91-1, at 1–2]. The Agreement states that entry into Defendant's facility is "conditioned upon, and permitted in consideration for Visitor reading, signing, and agreeing to the terms and conditions of this agreement." [83-7]. The Agreement contains the following exculpatory clause:

> Visitor assumes all risks of property damage and/or personal injury, including death, which Visitor may cause or incur as a result of being at the Facility, including but not limited to any damage, injury and/or death arising from Nucor's or its respective employees' negligence. To the fullest extent allowed by law, Visitor hereby releases and agrees to indemnify and hold harmless Nucor and Nucor's respective employees from any and all liability from any such damages, injuries and/or death and agrees and covenants on behalf of Visitor, and Visitor's heirs and/or assigns, not to sue or make any claim against Nucor or any of Nucor's respective employees for any such damages, injuries or death.

[*Id.*].

On March 12, 2018, Plaintiff delivered scrap steel from Waukesha Iron Company to Defendant pursuant to his independent contractor agreement with Starline Trucking. [83, at ¶ 6]. As part of this delivery, Plaintiff had to climb up onto the bed of his trailer and sweep scrap steel

4

into an area designated by Defendant. [*Id.*, at ¶ 15]. Plaintiff used Defendant's rolling staircase to exit the back of his truck. [83, at ¶ 18]. While he was on the highest platform of this staircase, its axel/wheel shaft broke, causing Plaintiff to fall. [*Id.*].

Plaintiffs subsequently brought this suit to recover for injuries Plaintiff Munoz sustained as a result of the fall, alleging both negligence and willful and wanton conduct. [73]. In its answer, Defendant raised three affirmative defenses based on the exculpatory clause in the Agreement signed by Plaintiff: that the claims may be barred by the doctrine of release, the doctrine of waiver, and by the signature on the Agreement. [See 77, at 3]. Plaintiffs moved for "summary judgment on [these] affirmative defenses." [81, at 1] (capitalization altered). Defendant cross-moved for summary judgment, arguing that the exculpatory clause bars Plaintiffs' claims. [88, at 1].

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). Generally, the Court considers cross-motions for summary judgment one at a time, construing all facts and drawing all reasonable inference in favor of the non-moving party. *Black Earth Meat Mkt., LLC*, 834 F.3d at 847.

**III.     Analysis**

The parties disagree on whether the Agreement is enforceable and, if so, whether the exculpatory clause covers Plaintiffs' negligence claim.  The parties also dispute whether the Plaintiffs' claim based on willful and wanton conduct can withstand summary judgment.

    **A.     Negligence Claim**

        **1.     Enforceability of the Agreement**

Plaintiffs argue that the exculpatory clause in the Agreement is unenforceable because (1) it was effective only on the date he signed it, January 8, 2018; (2) it was void for lack of consideration; and (3) it was against public policy.  [82, at 2–3].

            **a.     Term of Agreement**

Plaintiffs first argue that the Agreement was effective only on the date he signed it.  In doing so, they note that the contract did not include an end date and argue that the four-corners rule of contract interpretation requires the Court to conclude that the contract was therefore effective only on January 8, 2018.  However, as Defendant notes, when a contract does not contain a fixed end date, it is terminable at the will of either party under Illinois law.  See *Steinberg v. Keepper-Nagel Real Estate Investments, Inc.*, 303 N.E.2d 46, 48 (Ill. App. 1973) ("Where no definite time is fixed during which an executory contract shall continue in force, it is terminable at the will of either party * * *."); *Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 915 (Ill. App. 2004) (noting that contract "did not contain any provision for its termination" and concluding that contract was of "indefinite duration" and "terminable at will").

Here, the Agreement does not contain an end date and is therefore one of indefinite duration and terminable at will by either party.  In arguing otherwise, Plaintiffs rely on *Rico Industries, Inc. v. TLC Grp., Inc.*, 6 N.E.3d 415 (Ill. App. 2014).  However, that case involved a contract terminable

only by written consent of both parties and is therefore inapplicable here, where the contract does not contain such term. See *id.* at 422. Moreover, contrary to Plaintiffs' argument, the *Rico* court did not void the contract at issue and instead found it terminable at will. *Id.*, at 423–24; [99, at 7–8]. Because neither party here ever terminated the contract, it remained in effect on the date of the accident.

### b. Consideration

Next, Plaintiffs argue that the Agreement is unenforceable because it is not supported by consideration. [82, at 6–8; 99, at 8–9]. Defendant argues that the contract is supported by consideration because the Agreement states that "[e]ntry into this facility (the 'Facility') by the undersigned ('Visitor') is conditioned upon, and permitted in consideration for Visitor reading, signing, and agreeing to the terms and conditions of this agreement." [83-7]; see also [89, at 8–9]. Plaintiffs contend that permitting Munoz onto the facility is not sufficient consideration because Defendant had a preexisting duty to permit his entrance based on its contract with Waukesha Iron. As explained above, Defendant pays Waukesha Iron for scrap steel. [83, at ¶8]. Waukesha Iron is a customer of Starline, and Waukesha Iron pays Starline Trucking a fee to transport the scrap steel to Defendant. [*Id.*, at ¶¶ 8–9]. In turn, Starline Trucking pays its contractors a portion of this fee. [83-4, at 12].

Plaintiffs correctly note that the "pre-existing duty rule provides that where a party does what it is already legally obligated to do, there is no consideration as there is no detriment." *White v. Vill. of Homewood*, 628 N.E.2d 616, 618 (Ill. App. 1993). However, nothing in the record supports the inference that Defendant was legally obligated to let Plaintiff onto its property based on Waukesha Iron's agreement with Defendant. For example, no contract between Waukesha Iron and Defendant is included in the record. Instead, the record shows that Waukesha Iron provided

7

Starline Trucking's contractors' truck drivers "with various scrap materials," and that Starline would not pay a driver if the driver did not deliver a load. [83-5, at 42:21–43:13]. Absent any factual support for the contention that Defendant had a preexisting duty to permit Plaintiff onto its private property, Defendant had every right to condition Plaintiff's access to its facilities to conduct his business activities on Plaintiff's acceptance of Defendant's terms—including those set out in the exculpatory clause (and subject to the public policy concerns addressed below). In short, even when construing the record in the light most favorable to Plaintiffs, there is no question of fact as to whether the Agreement was supported by consideration. See *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (explaining that "[i]nferences supported only by speculation or conjecture will not" be sufficient to withstand summary judgment).

### c. Public Policy

Plaintiffs also argue that the exculpatory clause of the Agreement is unenforceable because it is against public policy. [82, at 5–6]. "Exculpatory agreements that are contrary to public policy include those (1) between an employer and employee; (2) between the public and those charged with a duty of public service * * *; and (3) between parties where there is such a disparity of bargaining power that the agreement does not represent a free choice on the part of the plaintiff, such as a monopoly or involving a plaintiff without a reasonable alternative." *White*, 628 N.E.2d at 619–20.

Here, the Agreement between Plaintiff and Defendant is not one between an employer and employee or between the public and those charged with a duty of public service. Therefore, for the Agreement to be contrary to public, there must have been a disparity of bargaining power between the Plaintiff and Defendant such that the Agreement "does not represent a free choice on the part of the" Plaintiff. *Id.* "Where the issue of unconscionability is alleged, the party alleging

the unconscionability has the burden at trial to produce sufficient evidence of unconscionability." *Reuben H. Donnelley Corp. v. Krasny Supply Co.*, 592 N.E.2d 8, 11 (Ill. App. 1991).

Plaintiffs explain that deliveries to Defendant constituted 18% of Plaintiff Munoz's total income for 2018 and about 40% of his income in April 2018. [83, at ¶¶ 11–12]. They argue that Munoz "had no choice but to sign the Gate Entry Agreement as he stood in line at the Nucor facility with a full load of scrap metal," and that had he "refused to sign the exculpatory agreement he would not have been allowed to dump his load of scrap steel and continue with his employment." [82, at 6].

This argument would perhaps have some force if Plaintiff fell on the day he signed the Agreement and was unaware that Defendant required visitors to sign an exculpatory agreement before he accepted the dispatch to Defendant's facility. However, Plaintiff signed the Agreement on January 8, 2018 [83, at ¶13], and he fell on March 12, 2018 [*Id.*, at ¶ 15]. He previously signed exculpatory agreements in 2016 and 2017. [91-1, at 1–2]. Moreover, his earnings and expenses statements demonstrate that there were other routes that he drove pursuant to his contract with Starline Trucking. [83-6]. Plaintiffs make no argument to why, as an independent contractor, Munoz was forced to continue making deliveries to Defendant after signing the Agreement. Accordingly, Plaintiffs have not met their burden of demonstrating that he was "without a reasonable alternative," and they are therefore not entitled to summary judgment on this ground. *White*, 628 N.E.2d at 620; see also *Reuben H. Donnelley Corp.*, 592 N.E.2d at 11.

Moreover, again construing the record in the light most favorable to Plaintiffs, there is no question of fact as to whether the Agreement was contrary to public policy. Starline Trucking's President testified that "contractors can reject [a] dispatch or choose to down their equipment or wait for a preferable load, because they're running their own business." [83-5, at 44:14–23].

Nothing in the record suggests that Starline Trucking would have treated Plaintiff less favorably had he rejected routes to Defendant's facilities. And, as noted above, Plaintiff's records show that Plaintiff accepted other delivery routes around the same time Plaintiff drove to Defendant's facilities. [83-6]. Moreover, even if Plaintiff could not have fully replaced the income he earned by driving to Defendant's facility by accepting other, equally profitable dispatches, Plaintiffs do not cite to any authority demonstrating that the loss of a portion of income leaves a party to a contract "without a reasonable alternative." *White*, 628 N.E.2d at 620. Accordingly, there is no question of fact as to whether the exculpatory Agreement is unenforceable as against public policy.

\* \* \*

For the reasons explained above, viewing the evidence in the light most favorable to Plaintiffs, there is no triable issue of fact concerning the enforceability of the Agreement on the day that Plaintiff sustained his injuries.

### 2. Scope of the Agreement

Plaintiffs next argue that even if the Agreement was enforceable at the time of the accident, the scope of the Agreement's exculpatory clause does not cover his negligence claim. [82, at 3–5; 99, at 1–7]. In Illinois, "exculpatory clauses are not favored and must be strictly construed against the benefitting party, particularly one who drafted the release." *Harris v. Walker*, 519 N.E.2d 917, 919 (Ill. 1988). "An exculpatory agreement must contain clear, explicit, and unequivocal language referencing the type of activity, circumstance, or situation that it encompasses and for which the plaintiff agrees to relieve the defendant from a duty of care." *Evans v. Lima Lima Flight Team, Inc.*, 869 N.E.2d 195, 203 (Ill. App. 2007). That said, the parties need "not have contemplated the precise occurrence which resulted in plaintiff's accident." *Schlessman v. Henson*, 413 N.E.2d 1252, 1254 (Ill. 1980). Instead, "the injury must only fall within the scope

10

of possible dangers ordinarily accompanying the activity and, therefore, reasonably contemplated by the parties." *Cox v. U.S. Fitness, LLC*, 2 N.E.3d 1211, 1215–16 (Ill. App. 2013) (quoting *Hamer v. City Segway Tours of Chicago, LLC*, 930 N.E.2d 578, 581 (Ill. App. 2010)). "In this way the plaintiff will be put on notice of the range of dangers for which he assumes the risk of injury, enabling him to minimize the risks by exercising a greater degree of caution." *Garrison v. Combined Fitness Ctr., Ltd.*, 559 N.E.2d 187, 190 (Ill. App. 1990). "The standard to be applied is a subjective one geared to a particular plaintiff and her situation * * *." *Larsen v. Vic Tanny Int'l*, 474 N.E.2d 729, 731 (Ill. App. 1984); see also *Harris*, 519 N.E.2d at 920 (considering fact that the plaintiff was an experienced horseback rider when determining whether exculpatory clause covered his claim). Although the scope of an exculpatory clause is often a question of fact, courts can also find that a plaintiff's claim is covered by an exculpatory clause as a matter of law. See, e.g., *Cox*, 2 N.E.3d at 1216 (determining that the plaintiff's claim was "within the scope of the release * * *as a matter of law"); *Simpson v. Byron Dragway, Inc.*, 569 N.E.2d 579, 585 (Ill. App. 1991) (collecting cases).

As Defendant explains, the Illinois Supreme Court has stated that "when the parties adopt broad language in a release, it is reasonable to interpret the intended coverage to be as broad as the risks that are obvious to experienced participants." *Harris*, 519 N.E.2d at 920; see also *Schlessman*, 413 N.E.2d at 1254 ("In adopting the broad language employed in the agreement, it seems reasonable to conclude that the parties contemplated the similarly broad range of accidents which occur in auto racing."). Here, the language of the Agreement is broad, stating that "Visitor assumes all risks of property damage and/or personal injury, including death, which Visitor may cause or incur as a result of being at the Facility, including but not limited to any damage, injury and/or death arising from Nucor's or its respective employees' negligence." [87-3]. Thus, the

11

exculpatory clause covers Plaintiffs' claim if an accident caused by a negligently maintained rolling staircase is within the scope of risks that Plaintiff would reasonably have contemplated he would encounter when unloading steel at Defendant's facility.[5]

Plaintiffs argue that the exculpatory clause does not cover Munoz's injuries here because it does not reference equipment, state to whom it applies, or describe to which activities it applies. [82, at 4–5; 99, at 2, 6]. On the first point, Illinois courts have found exculpatory clauses to cover equipment even when the clauses do not specifically reference equipment. For example, in *Falkner v. Hinckley Parachute Center., Inc.*, 533 N.E.2d 941 (Ill. App. 1989), the Court found that an exculpatory clause covered a death caused by faulty equipment even though "the clause d[id] not specifically contemplate or mention the risk from unsafe equipment." *Id.* at 946. The court noted that the agreement stated that the defendants were "to provide a qualified instructor, equipment, aircraft, and supervisory personnel," and that it "specifically exempt[ed] defendants from liability for injuries to decedent while participating in any activity of defendants whether those injuries result from defendants' negligence or other causes." *Id.*, at 945–46. Similarly, Plaintiff knew that Defendant provided him with the rolling staircase, and the Agreement exempted Defendant from liability for its own negligence. Accordingly, the fact that the exculpatory clause did not specifically reference equipment does not mean that it does not cover Plaintiffs' claim.

Plaintiffs further argue that their claim is not barred by the exculpatory clause because it does not state to whom it applies. But Illinois courts do not require exculpatory agreements to

---

[5] Plaintiffs argue that considering "the experience and relationship of the parties" violates Illinois law dictating that (1) extrinsic evidence can be considered only when contract language is ambiguous and (2) parole evidence cannot be used to supply missing terms. [99, at 5–6]. However, Illinois courts are clear that determining the scope of an exculpatory clause requires a subjective analysis, and therefore this information is a required part of the analysis and not impermissible extrinsic evidence. See *Harris*, 519 N.E.2d at 920; *Larsen*, 474 N.E.2d at 731.

12

specify this information. For example, the agreement in *Schlessman* stated that it applied to the "Undersigned." *Schlessman*, 413 N.E.2d at 1253. Here, the agreement applies to a "Visitor." [83-7]. Plaintiffs also argue that the exculpatory agreement does not cover their claim because it does not specify the activity it covers. It is true that some exculpatory clauses do specify an activity. See, *e.g.*, *Harris*, 519 N.E.2d at 919 (analyzing exculpatory clause covering "any injury which may result from horseback riding"). However, in *Schlessman*, the clause did not describe any activity and instead covered all claims for injuries occurring "while the Undersigned is upon the Restricted Area." [6] *Schlessman*, 413 N.E.2d at 1253; see also *Evans*, 869 N.E.2d at 203 (explaining that exculpatory agreements should "referenc[e] the type of activity, circumstance, *or* situation that it encompasses" (emphasis added)). The agreement here similarly covers injuries a "Visitor may cause or incur as a result of being at the Facility." [83-7]. Thus, exculpatory agreements need not necessarily refer to the specific types of individuals or activities they cover in order to be valid, and the Agreement here is not invalid to the extent it fails to do so.

Next, Plaintiffs analogize this case to two involving injuries at gyms. In *Hawkins v. Capital Fitness, Inc.*, 29 N.E.3d 442 (Ill. App. 2015), the plaintiff was injured at a gym when a mirror fell off a wall and hit his head. *Id.* at 445. He signed an exculpatory agreement that covered injuries arising from the "use of equipment." *Id.* at 444–45. The court determined that, unlike an injury caused by gym equipment, a falling mirror was outside of the scope of risks reasonably contemplated by the plaintiff. *Id.* at 448–49. It also explained that if he assumed the risk of falling

---

[6] Plaintiffs attempt to distinguish *Schlessman*, where the court found that a broad exculpatory clause covered injuries the plaintiff, an amateur racecar driver, suffered when "a portion of the upper track embankment collapsed, causing [his] car to crash." *Schlessman*, 413 N.E.2d at 1253. Plaintiffs argue that the injury in *Schlessman* was caused by "a catastrophic 'freak accident,'" and that his injury "pales in comparison to the dramatic and unforeseen nature of" that case. [99, at 3]. However, the fact that injuries caused by such an "unforeseen" accident were nevertheless within the scope of the exculpatory clause suggests that Plaintiff's injuries—which Plaintiffs suggest were *more* foreseeable than those in *Schlessman*—should likewise be covered by the scope of the exculpatory clause.

13

mirrors, then in order to protect himself, the plaintiff would need to wear "protective equipment, like a helmet," or "conduct a personal, comprehensive investigation of all aspects of the facility, including the quality and fit of every mirror." *Id.* And it reasoned that undertaking such steps would be "untenable according to the standards of common experience." *Id.* at 449 (quoting *Larsen*, 474 N.E.2d at 733). However, in contrast to the mirror in *Hawkins*, the rolling staircase was equipment that Plaintiff knew he would use. [See 83-1, at 28:23–29:11]. Moreover, expecting truck drivers to inspect a rolling staircase before using it is not "untenable according to the standards of common experience." *Hawkins*, 29 N.E.3d at 449 (quoting *Larsen*, 474 N.E.2d at 732).

Plaintiffs also rely heavily on *Locke v. Life Time Fitness, Inc.*, 20 F. Supp. 3d 669 (N.D. Ill. 2014). There, a man died at a health and fitness club after suffering a heart attack while playing basketball. *Id.* at 671. He signed an agreement that he would not bring a claim against the club, including those based on "[i]njuries or medical disorders resulting from exercise at a Life Time Fitness center" and "[i]njuries resulting from the actions taken or decisions made regarding medical or survival procedures." *Id.* at 672. His widow brought a suit against the club, alleging that the club negligently failed to train its employees on health emergencies and that this failure to train caused her husband's death. *Id.* at 673–74. The court determined that the widow's claim did not fall within the scope of the exculpatory agreement because her husband "reasonably could have believed that employees at a fitness center, where individuals exercise and thus increase the likelihood of a heart attack, would be trained to recognize heart attack symptoms, and know the proper procedures to follow until EMS personnel arrives." *Id.* at 674. Plaintiffs assert that, similar to *Locke*, the exculpatory clause here does not cover their claim because it "does not contain language which would insulate [Defendant] from liability for injuries caused by the provision of a

14

dangerous and defective piece of equipment." [82, at 4]. But the *Locke* court explained that the exculpatory clause there did not cover the claim because the allegation that the employees were improperly trained was a step removed from a claim that they acted negligently. See *Locke*, 20 F. Supp. 3d at 673 ("[I]n the instant action, [the plaintiff] asserts *more* than that [her husband] died of a heart attack and that Life Time employees made several poor decisions that resulted in [his] death." (emphasis added)). Here, there is not a similar step between Plaintiffs' claim and the exculpatory clause. Moreover, even if *Locke* in isolation suggests that Plaintiffs' claim is not in the scope of the exculpatory clause, when considering it alongside other Illinois caselaw, it does not carry the day for Plaintiffs.

In short, Plaintiff had been hauling steal to Defendant's facility five days a week. [83-1, at 28:1–7]. Whenever he had to sweep steel out of the back of his truck, he used the rolling stairs provided by Defendant. [*Id.*, at 29:5–23]. He signed an Agreement that exempted Defendant from liability for injuries Plaintiff incurred due to Defendant's negligence. [83-7]. Based on the foregoing, a claim that Plaintiff was injured because Defendant negligently maintained the rolling staircase is within "the scope of possible dangers * * *reasonably contemplated by the parties." *Cox*, 2 N.E.3d at 1215–16. Moreover, this case is unlike those where Illinois courts refused to find that the scope of the exculpatory clause covered the injuries as a matter of law. See, *e.g.*, *Larsen*, 474 N.E.2d at 733 (determining that whether injuries caused by harmful vapors created when gym mixed cleaning compounds were within scope of exculpatory clause was a fact question for the jury); *Simpson*, 569 N.E.2d at 584–85 (determining that whether injuries caused by deer entering racetrack were within scope of exculpatory clause was a fact question for the jury). Accordingly, the exculpatory clause covers Plaintiffs' negligence claim, and this is true even when construing

15

the facts in the light most favorable to Plaintiffs. As such, Defendant is entitled to summary judgment on Plaintiffs' negligence claim based on its affirmative defenses.

### B. Willful and Wanton Claim

Plaintiffs brought a complaint based on Defendant's negligence and, in the alternative, based on Defendant's willful and wanton conduct in failing to maintain the rolling staircase. [73]. Plaintiffs argue that even if their negligence claim fails, their willful and wanton one survives. [82, at 8–11; 99, at 9–11]. As Plaintiffs explain, exculpatory claims do not cover willful and wanton conduct as a matter of public policy. See *Davis v. Commonwealth Edison Co.*, 336 N.E.2d 881, 885 (Ill. 1975) (explaining that "an agreement to indemnify against wilful misconduct would, as a general rule, be contrary to public policy and unenforceable"). "Willful and wanton conduct may be intentional or the result of a reckless disregard for the safety of others." *Mostafa v. City of Hickory Hills*, 677 N.E.2d 1312, 1319 (Ill. App. 1997). "In order to find that a defendant is guilty of willful and wanton misconduct, it must be shown that a defendant had actual or constructive knowledge that his conduct posed a high probability of serious physical harm to others." *Martin v. Illinois Cent. Gulf R.R.*, 606 N.E.2d 9, 13 (Ill. App. 1991) (internal quotation marks omitted). Someone commits a "nonintentional willful or wanton act" when he or she "(a) fails, after knowledge of an impending danger, to exercise ordinary care to prevent the danger or (b) fails to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." *Oelze v. Score Sports Venture, LLC*, 927 N.E.2d 137, 148 (Ill. App. 2010). "The actor need not [s]ubjectively appreciate the high probability of serious physical harm which his conduct poses; it is sufficient if a reasonable man in his position would be brought to such a realization by the circumstances he knows or has reason to know of." *Landers v. Sch. Dist. No. 203, O'Fallon*, 383 N.E.2d 645, 647 (Ill. App. 1978). Thus, for Plaintiffs' claim to survive

16

summary judgment, the evidence construed in their favor must at minimum demonstrate that a reasonable person in Defendant's position would know that its maintenance of the rolling staircase posed a "high probability of serious physical harm to others." *Martin*, 606 N.E.2d at 13.

Plaintiffs argue that Defendant engaged in willful and wanton conduct when it stored the rolling staircase outside, failed to inspect it, and failed to conduct any maintenance on it. [82, at 9–11]. They assert that it is "common sense that metal parts rust and decay in the elements," and that therefore Defendant should have known that its maintenance of the rolling staircase would likely cause injury. [99, at 10]. Defendant counters that its conduct was not willful and wanton because nothing in the record demonstrates that it should have known that it should have performed maintenance on the rolling staircase or stored it inside. [89, at 9-11]. For example, Defendant continues, nothing in the record suggests that the rolling staircase was not fit for outside storage or required any particular maintenance. [*Id.*, at 11].

Plaintiffs primarily rely on *Oelze v. Score Sports Venture, LLC*, 927 N.E.2d 137 (Ill. App. 2010). [See 82, at 9–10; 99, at 10–11]. There, the plaintiff sustained injuries while playing a tennis match when she tripped on a rope ladder stored directly on the other side of a curtain that bordered the indoor tennis court. *Id.* at 141–42. The court found a fact question as to whether the tennis club engaged in willful and wanton conduct. *Id.* at 150. Plaintiffs suggest the *Oelze* court did so because "[i]t was common sense that the rope ladder being on the ground was inherently dangerous." [99, at 10]. However, contrary to this suggestion, the court recounted testimony from employees of the club and concluded that it was "clear that defendant and its employees were very conscious of the danger caused by objects on the floor of the walkway closely behind the curtain." *Id.*, at 142–43, 149. For example, the club "endeavored to eliminate the danger caused by an object closely behind the curtain by trying to avoid having any object closer than two feet from the

17

curtain, having the walkways cleaned three times per week, instructing its employees to keep the walkways clear and to pick up any stray objects and put them away where they belonged." *Id.* at 149. Thus, the court in *Oelze* relied on the defendant's knowledge of the risk of harm, and not mere common sense.

Plaintiffs here rely on pictures of the rolling staircase showing that it was rusty and that a bar at the bottom was disconnected from one of the wheels. [83, at ¶ 19]; see also [83-10; 83-11; 83-12]. Plaintiffs also cite to testimony from Defendant's Health and Safety Director, Paul Labriola, in which Labriola states that he assumed that Plaintiff fell because the weld between the axel and the wheel broke. [83, at ¶ 19]; see also [83-8, at 17–19]. This evidence shows the state of the rolling staircase after Plaintiff fell. However, as Defendant notes, nothing in the record suggests that Defendant knew or had reason to know that the rolling staircase was in poor condition, needed regular or urgent maintenance, or should not have been stored outside. Moreover, the failure to maintain a ladder suffering from wear and tear accumulated over a period of use sounds in negligence (at most), not in willful and wanton conduct, where the record is devoid of any knowledge of the supposedly dangerous condition that could lead to the inference of "conscious" or "intentional" disregard on Defendant's part. See *Bartolucci v. Faletti*, 382 Ill. 168, 174 (1943). In short, unlike the defendant in *Oelze*, nothing in the record—even when construed in the light most favorable to Plaintiff—indicates that someone in Defendant's position should have known that its maintenance of the staircase posed a "high probability of serious physical harm to others." *Martin*, 606 N.E.2d at 13. Accordingly, Defendant is entitled to summary judgment on Plaintiff's willful and wanton conduct claim.

## IV. Conclusion

For the reasons stated above, the Court denies Plaintiffs' motion for summary judgment [81] and grants Defendant's motion for summary judgment [88].

Dated: January 25, 2021

_____
Robert M. Dow, Jr.
United States District Judge